# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> WALTER ADONAI RIVERA CHINCHILLA, <br><br> Defendant. | 3:24-cr-00238-KDB <br><br> **MEMORANDUM IN SUPPORT OF SENTENCING** |

## I. INTRODUCTION[1]

Walter Rivera Chinchilla is before this Court awaiting sentencing on one count of trafficking in firearms. Before his arrest at the age of twenty-three, he experienced profound and sustained economic insecurity, exposure to violence in his home, and the loss—one to incarceration, one to death—of each of his close family members. Now facing prison for the first time in his life, he is asking the Court to vary downward from the current advisory guideline range. In particular, he hopes to show through this Memorandum and arguments offered at the sentencing hearing that a sentence of 78 months imprisonment is sufficient but not greater than necessary. 18 U.S.C. § 3553.

## II. HISTORY AND CHARACTERISTICS

### a. Early Instability and Poverty

Walter says that his mother "made the best of it." Dora Amanda Chinchilla, who also goes by Gloria, grew up in Honduras. In her early twenties, she met Walter's father, Pedro Rivera; he paid a coyote to bring her to the United States for a better life. Although young, she already had four children by then, but

---

[1] The facts in this Memorandum are based on the discovery, the Court file, and defense counsel's investigation in this case, unless otherwise noted.

1

there was not enough money to bring them with her. They would not reunite for another sixteen years.[2] In America, Gloria had her first son Pedro and then Walter soon after. The relationship between Gloria and Pedro Sr. was rocky, and Pedro Sr. traveled a lot to find work. Before Walter was out of toddlerhood, Pedro Sr. returned to Honduras. Walter has no memories of his father until a family reunion in the United States shortly before his arrest. In the words of Pedro Jr., Walter's mother was "mother and father both" to them.

And she was overwhelmed right from the start. She spoke broken English, had no education to speak of, and had to find enough work to feed and clothe two children. The small family's many interactions with the Department of Social Services began when Walter was barely one year old. Exhibit 1. He was admitted to the hospital for problems with his asthma, which stemmed from his difficult, premature birth. He arrived at thirty-two weeks, and he had to stay on a ventilator and in the hospital for four weeks. When he was admitted to the hospital just before his first birthday, hospital staff struggled to contact Gloria. Because she only visited Walter twice while he was there, the nursing staff called DSS. They needed to explain his asthma care to her before Walter could be discharged, and they were also worried because Walter appeared emotionally neglected:

> IT IS NOT KNOWN WHEN THE CHILD WILL BE READY FOR DISCHARGE, SINCE MOM HAS NOT BEEN THERE FOR TEACHING. THE CHILD DOESN'T HAVE MUCH EFFECT AND DOESN'T SMILE OR SEEM TO CARE IF PEOPLE COME AND GO OUT OF THE ROOM. THEY ARE CONCERNED THAT THE CHILD MAY BE USE TO BEING LEFT ALONE.

The DSS investigation showed that Gloria was working odd hours and relying on neighbors to care for her children when she could not. Because she did meet with the pulmonologist soon after the report was made, the hospital discharged Walter to her care and DSS closed the investigation.

Walter remembers the help they got from neighbors throughout his childhood as his mother

---

[2] Her four oldest children moved in with Gloria, Pedro Jr., and Walter in approximately 2014. The three girls each moved out when they met the men who would become their husbands; one sister subsequently died in a freak lightning accident. The boy tried to stab Gloria during an argument. Although she did not press charges, he was forced to move out. Neither Walter nor Pedro Jr. has ever felt close to these siblings.

struggled to make ends meet. The neighbors' support kept him from feeling neglected or from being unsupervised. As for his mother, Walter said she was always working different jobs: cooking, cleaning, salvaging cars, selling food, anything and everything she could think of. He knew that they didn't have much because their "new" clothes were from Goodwill. Sometimes there wasn't enough food, and they had to move a lot. Even though he was only a year older than Walter, Pedro Jr. felt responsible for helping his mother raise Walter. Even in his childhood, Pedro Jr. remembers "hustling" to get extra cash to buy Walter school supplies and clothes. When he was twelve, he starting doing roofing work to help with the bills.

Needless to say, Gloria often couldn't make rent. Records show that the family was formally evicted in Mecklenburg County in 2004, 2007, 2009, 2012, and 2013. Exhibit 2. They moved more than that, though. Walter can remember no fewer than twelve different places that they lived growing up and says, "we got kicked out of almost all of them. We was *struggling* struggling." Although they qualified for government assistance, he said his mother felt too much pride to accept it. They felt that "the state discriminates and stuff like that when you have it."

This financial instability naturally affected Walter at school. His records show that throughout his time at various CMS schools, he had high absenteeism, and his grades were uniformly poor. Exhibit 3. When he was six years old in kindergarten (2007), the school had him evaluated because his speech was below grade level. Exhibit 4. Walter's mother did not participate in the evaluation or the meeting.

> **Explanation of team signatures/ absence of signatures (if needed):**
> Mrs. Chinchilla did not attend this meeting, thus her signature is not on this form.

The school determined, however, that the source of the problem was merely "his not knowing the correct English pronunciations." No services were provided—but the problem did not improve on its own. He was again assessed for literacy fluency in the fifth grade (2012) based on low performance on standardized

testing. Exhibit 5. It appears that the only intervention was to devote some extra classroom time to reading.

There is no record of Walter receiving a comprehensive evaluation while in school. Had they done so, they would have flagged the socioeconomic risk factors present in Walter's home life as well as low intellectual functioning that suggest he would have benefited from more targeted academic interventions. During the pendency of this case, counsel had Walter evaluated by Dr. Angela de Varona, Ph.D.[3] Dr. de Varona administered IQ testing on Walter in both English and Spanish to rule out the effect that his bilingualism may have on the testing. She concluded as follows:

> The test results are similar regardless of language. Mr. Chinchilla's overall intellectual ability is in the very low/borderline range. His performance resulted in a standard score of 78 and a percentile rank of 7 on the WAIS-IV Full Scale IQ score and a standard score of 75 and a percentile rank of 5 on a combined score on the Batería IV Woodcock Muñoz.
>
> Although Mr. Chinchilla's scores are not in the range used in determining intellectual disability, his performance is significantly lower than expected. People with borderline intellectual functioning typically can manage simple tasks of daily functioning. However, they have difficulty with problem solving and with understanding or managing higher level concepts. Mr. Chinchilla will continue to be challenged when faced with problems and with the need to use higher level concepts.

While it would be scientifically improper to conclude that Walter's score in 2025 is the same as it would have been in 2015 or earlier in his childhood, there is a reasonable inference that unexplored overall intellectual ability was one of the factors contributing to his poor performance in school. Unfortunately, neither Walter's mother nor the school had the capacity or the initiative to intervene early in his life.

### b. Violence and Crime in the Home

Walter recalls his mother doing her level best to care for him and his older brother—and while this may be true, her best included physical violence directed toward her children. Two separate times, DSS had to investigate reports of physical abuse. In 2004, a reporter observed Pedro Jr. (age 5) with bruises on his limbs and body as well as "a thick mark, about 1 1/2 inches wide which extends from his back right

---

[3] Filed separately under seal.

shoulder and goes over his shoulder." Exhibit 6. The investigation revealed that Pedro Jr. was acting out sexually with another child while in the care of a relative. When she came home and heard about it, Gloria disciplined Pedro Jr. with a belt. The investigation further revealed that the children had inappropriate exposure and access to adult sexual materials. DSS educated the family about discipline and supervision and closed the case.

The physical abuse, however, did not stop. In 2007, DSS returned to investigate a complaint involving both children in which Gloria was accused of leaving black marks on their hands after catching them collecting cans. Exhibit 7. She also gave Pedro Jr. a swollen lip and facial bruises.



The children, though, denied the accusations. When interviewed, Walter (7) began to cry and said he did not know what happened, ultimately affirming a story about getting injured in a fall. Both children generally denied that their mother used physical discipline on them. Given the denials, DSS closed the case as unsubstantiated. In his adulthood, though, Pedro Jr. recounts that their mother routinely "whooped" them with "belts and cables." They "got whooped *hard*" the way their mom got whooped in her home country. She "sometimes went too far" but "knew how to cover it up." They got whooped for things like skipping school or talking back—or collecting cans in the neighborhood.

The final DSS intervention coincided with a police investigation in 2013. Exhibit 8. The police secured a search warrant at her home because of a suspicion—ultimately corroborated—that she was selling alcohol out of her home and enlisting one of her children (Pedro Jr., 14) in the business.

> Narrative:
> 02/09/2013
> Charlotte-Mecklenburg Police Department officers executed a search warrant at 8519 apartment 8 Lodge South Circle Charlotte, NC 28217. The suspect was charged with selling alcoholic beverages without having a permit issued by the Alcoholic Beverage Commission of North Carolina. One of the suspects minor children collected money, sold alcoholic beverages, delivered alcoholic beverages to customers then turned the money over to his mother. Another minor child was present in the residence while the liquor house operation was operational. Powder Cocaine was located inside the residence.

During the search, the condition of the house was observed to be generally messy, filled with trash, and with dog feces on the floor; they also found cocaine in the house. Walter (12) was asle ep in his bedroom when the search began. Gloria denied or minimized the behavior during her interview with DSS, and the social worker remarked, "the mother is less concerned with her own safety, much less that of her children. The priority appears to be finding an efficient means to make money to care for her family." Sandra, Walter's older paternal half-sister who was around to some degree while Walter was growing up, recalls the liquor house time period. She confirmed that the kids saw "adult activities" and adds that Gloria had alcohol abuse problems of her own, which affected her ability to supervise and actively parent the boys.

### c. Walter on his Own

In the ninth grade (2016-17), Walter dropped out of school as his brother had done before him. His mother was chronically sick; as far back as 2012, she shared with DSS that she had kidney and heart problems.[4] Walter felt that it was his duty to make money to help the family. Pedro Jr. had the same reason. He said that there was never enough money for rent and food, so he just stopped going. He did not encourage Walter to do the same—but their mother also did not *dis*courage either of them from quitting school. Though in the past she had disciplined (whooped) them for missing school, by their teens, she decided that if they were missing class all the time anyway, they may as well work and pay into the household.

In 2017, Walter's brother was arrested and ultimately convicted for a string of serious robberies. Exhibit 9. By that time, his role in Walter's life was as a protector, mostly financially. Pedro Jr. had, in his

---

[4] This report is not deemed relevant to this Memorandum; it concerns Walter's brother's use of a bb gun.

words, "fallen in with the wrong crowd," but he kept those friends away from his home life with his mother and brother. In fact, Pedro Jr. recalled that Walter told Pedro to "fall back from your friends" when Pedro started getting in trouble. But he didn't, and his arrest left Walter and Gloria alone.

But the following year, Gloria suddenly died. The last time he saw his mother, Walter gave her a big hug. Then, on his way to work, he got arrested for driving without a license. Dkt. # 49, ¶61. While he was held at the local jail, she collapsed and fell into a coma. He never saw her conscious again. In Walter's words, "I lost my mother at seventeen. Lost my brother to the system at sixteen. They were the only two people that really were there for me."

In addition to his grief, Walter had to contend with how he could make rent on the apartment he shared with his mother. He tried to contact his father, who was in Honduras, but he said he couldn't do anything. Other extended family members had the same answer, until Walter spoke with an "uncle" (a cousin of his mother's) who offered some limited support in the form of referrals to jobs or housing. Walter had been seeing his girlfriend Anna since shortly after he dropped out of school when he was sixteen. When his landlord refused to extend the lease on the apartment he shared with his mother just to him, Walter and Anna found a place together—the cheapest they could get.

Around 2019, they added to their household. Anna's parents "abandoned" Anna and her two younger siblings, Angie and Caesar, so Anna was for all intents and purposes their parent. Walter then assumed the role of step-father. Angie has shared that Walter took them to school, purchased school supplies for them, bought their clothes and food, and provided shelter. Walter, who grew up with nothing, tried to give them everything. And Walter, who was left with no real family, tried to build one. But Anna broke up with Walter in late 2022. He experienced this, too, as a profound loss. It was also expensive in the way that divorces are: because of her dependent siblings, she kept all or most of their mutual possessions, and Walter had to start over. Nevertheless, what he did not do was turn his back on Anna's siblings. Even when they were in different households, Walter helped them with money as much as he could up until his

arrest in this case.

### d. Incarceration, and Release Plan

Walter has been in pretrial custody for over a year and housed at many different facilities. Where available, he has taken educational classes. Exhibit 10. His first and most important step upon transfer to the Bureau of Prisons will be to earn his GED, and he checked a book out of the jail library called "Getting Your GED" so he can learn what to expect and begin preparing as much as possible. He has strong work skills already and wants to expand upon that base to ensure that he can support himself upon release. His goal, therefore, is to be accepted into the Federal Prison Industries Program. Exhibit 11. As the Court may know, "FPI reduces recidivism" and helps "individuals acquire the skills necessary to successfully make the transition form prison to law-abiding, tax paying, productive members of society." FPI is available at Butner, to which Walter requests a recommendation.

### III. DISCUSSION

### a. Walter's history and characteristics merit a downward variance.

Walter's early life was precarious. His single mother could not reliably keep Walter and her brother housed, clothed, or fed. Practically, this forced the family to relocate often and contributed to Walter's poor performance in school and his ultimate failure to graduate. Psychologically, he lived with the fear of not having enough money each and every day. Walter as a child and then as a young adult supporting himself and his adopted family never knew a day without financial worry. Research has shown that "the inherent stress of living in poverty has the capacity to negatively impact the decision-making processes involved in problem-solving, goal-setting, and goal attainment." Elizabeth Babcock, *Using Brain Science to Design New Pathways Out of Poverty* 5 (2014), https://s3.amazonaws.com/empath-website/pdf/Research-UsingBrainScienceDesignPathwaysPoverty-0114.pdf. Exposure to poverty negatively affects "the processes by which individuals consciously reflect upon, rather than merely instinctively react to, circumstances and, after reflecting, make reasoned decisions on how to proceed." *Id.* Behaviorally,

moreover, the 2013 liquor house incident shows that Walter was taught by example that breaking the law was an acceptable way to make ends meet.

While recognizing that the harm from his offense is to public safety, his motivation was financial. Walter had no safety net, and even meeting basic housing needs is difficult for low-income people without a high school degree. Indeed, Charlotte's affordable housing crisis is well-known, with The United Way reporting that only 8% of available rentals in the area are considered affordable. *Understanding the Affordable Housing Crisis in Charlotte* (April 8, 2025), https://unitedwaygreaterclt.org/blog/a-home-for-all/understanding-the-affordable-housing-crisis-in-charlotte/. Similarly, the City of Charlotte has published data showing an affordability gap of over 40,000 units in Mecklenburg County. *Estimated Gap in Affordable Rental Units in the City of Charlotte and Mecklenburg County*, 2023, https://tableau.charlottenc.gov/t/Public/views/RentalAffordabilityGap/Dashboard?%3Aembed=y&%3Aiid=1&%3AisGuestRedirectFromVizportal=y.

It must be mentioned that Walter is still a young man, only recently turned twenty-five but twenty-three at the time of his offense. His errors should be viewed through the lens of his youth, as should his capacity for rehabilitation. Indeed, research shows that "the prefrontal cortex remains responsive to stimulation well into adulthood. Its plasticity enables it to continue, even in adulthood, to grow and strengthen new neural pathways that can support EF [executive functioning] skills." Babcock*, supra.* Both the Fourth Circuit Court of Appeals and the Supreme Court have recognized, in the sentencing context, the diminished culpability of juvenile offenders, given their lack of maturity, vulnerability to social pressures, and malleable identities. *See, e.g., United States v. Howard*, 773 F.3d 519 (4th Cir. 1014); *Miller v. Alabama*, 132 S. Ct. 2455, 2464 (2012)); *Graham v. Florida*, 560 U.S. 48, 68 (2010); *Roper v. Simmons*, 543 U.S. 551, 569-70 (2005). "These salient characteristics mean that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate transient immaturity, and the rare juvenile

offender whose crime reflects irreparable corruption.'" *Graham*, 560 U.S. at 68 (quoting *Roper*, 543 U.S. at 573). As noted by *Roper*, *Graham*, and *Miller*, the frequency of criminal offending increases in late adolescence and then tapers off in early adulthood. *Accord* U.S.S.G Appendix B (Part III) §5H1.1.

In sum, Walter's chronic poverty, his lack of youthful guidance, and his young age together support a downward variance in this case.

b.  **The guidelines punish the same wrongdoing in multiple enhancements, and a downward variance is therefore warranted.**

The recommended guideline sentence is greater than necessary because it punishes the same wrongdoing repeatedly: transferring firearms to those who should not have them within and, at times, without the country. This primary harm is captured in three separate locations for a total of <u>thirteen offense level points</u>. First, the base offense level was increased by six points because Walter was convicted of firearm trafficking of a firearm with a large-capacity magazine, where trafficking is defined by transfer or similar actions to those whose possession would be felonious (in this case, by virtue of the recipient's immigration status). Dkt. #49, ¶32; 18 U.S.C. § 933(a)(1).[5] Second, he received a five-point enhancement because he transferred firearms with reason to believe the recipient would use or dispose of them unlawfully (in this case, unlawfulness defined by immigration status and/or unlawful transfer out of the country). Dkt. #49, ¶ 34. Third, he received a four-point enhancement for transferring a firearm with reason to believe it would be transported out of the country. Dkt. #49, ¶35.

On the facts of this particular case, these separate sources of offense level points do not point

---

[5] The PSR further writes that the offense was committed with knowledge that the offense would result in the transfer to a prohibited person. This is a technical error as that clause of U.S.S.G. § 2K2.1(a)(4)(B) only applies to convictions under 18 U.S.C. § 922(a)(6) or (924(a)(1)(A). That conduct is already encoded within § 933.
10

to distinct harms or sources of culpability but to the same or overlapping conduct. The severity of the offense, which is indisputably high, is in this way overstated by the guidelines. It is not the defense position that all thirteen points ought to collapse together but that the requested four-level variance is reasonable[6] to offset the overstatement. Moreover, these enhancements and indeed the offense of conviction are the result of Congressional directives in 2022 that took effect in the 2023 revisions to § 2K2.1. *See* U.S.S.G. § 2K2.1, Amendment 819 ("This multi-part amendment responds to the directive in section 12004(a)(5) of the Bipartisan Safer Communities Act . . . ."). Guidelines that are the product of Congressional directive (i.e. politics) rather than the deliberative, evidence-based process that ordinarily characterizes the Commission's revisions are fairly afforded less weight. *See Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007). *See also Gall v. United States*, 552 U.S. 38, 49–50 (2007) (the sentencing court "may not presume that the Guidelines range is reasonable" and "must make an individualized assessment based on the facts presented").

### c. The remaining § 3553 factors do not weigh against a higher sentence.

*Seriousness of offense/promote respect for the law/provide just punishment:* The defense request for seventy-eight months – six and a half years – is a serious sentence for a serious offense committed by a young man with zero criminal history points. (Note, as well, that most defendants with his criminal history score would receive an adjustment as a zero-point offender under § 4C1.1, but Mr. Chinchilla did not.)[7]

*Deterrence:* A sentence of seventy-eight months is sufficient for specific and general deterrence. As to Mr. Chinchilla in particular, there is specific deterrence value in the fact that he will henceforth be a person prohibited from possessing any firearms or ammunition, rendering a repetition of this crime impossible. Moreover, he will be subject to hundreds of collateral consequences from this conviction.

---

[6] On its own or in combination with the other factors raised in this Memorandum.

[7] The Commission calculated that in fiscal year 2024, 72.6% of defendants with zero criminal history points received this adjustment. Quick Facts: Zero-Point Individuals, https://www.ussc.gov/research/quick-facts/zero-point-individuals.

According to the National Inventory of Collateral Consequences of Conviction, there are 391 mandatory or automatic consequences in North Carolina and federally from being convicted of this felony weapons offense. As to general deterrence, the value of lengthy prison sentences is limited. *See e.g.,* Jacob D. Charles & Brandon L. Garrett, *The Trajectory of Federal Gun Crimes*, 170 U. Pa. L. Rev. 637, 694 (Feb. 2022) ("The research is clear that imposing increasingly harsh sentences is not an effective way to reduce gun crime.") (gathering sources); *see also* Matthew Makarios & Travis C. Pratt, *The Effectiveness of Policies and Programs that Attempt to Reduce Firearm Violence: A Meta-Analysis*, 58 Crime & Delinquency 222, at 236 (2012) (finding a "weak" relationship between enhanced prison terms and gun violence). *See also* Carrie Johnson, *Lawmakers Rip Gun-Tracking Effort In Mexico*, NPR (June 24, 2011), https://n.pr/3LfVPyu (quoting former prosecutor's assessment that "when you're talking about straw buyers, or straw purchasers, you're talking about people who are very fungible . . . . You can arrest and charge and convict a hundred straw buyers and you're not going to have an impact on the organization, you're not going to help public safety."). And prosecuting a first-time offender in federal court itself sends a strong message of deterrence to others.

*Protection of the public:* For a zero-point offender, there is little reason to believe that incapacitation beyond the requested seventy-eight months is necessary. Indeed, the Commission's research demonstrates that this group, to which Mr. Chinchilla belongs, has "considerably lower recidivism rates than other offenders, including offenders with one criminal history point." U.S.S.G. § 4C1.1, Amendment 821 (citing U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), *available at* https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010). Note that although the Commission excluded certain offenses from the benefit of the reduction "in light of the seriousness of the instant offense of conviction," that policy choice does not change the data concerning recidivism, which remains a compelling basis on which to conclude that a longer sentence is not necessary for incapacitation in this case.

*The need for treatment:* Mr. Chinchilla has modest treatment needs that can be addressed within the length of the requested sentence. Moreover, as described above, he has a plan to utilize the resources of the BOP to earn his GED and secure tangible, transferrable employment skills that will facilitate his rehabilitation and reentry.

*The need to avoid unwarranted sentencing disparities:* The statute and guideline enhancements that are driving Mr. Chinchilla's advisory sentence are relatively new, and comparisons to similar cases are therefore hard to come by. In fiscal year 2024, only twelve defendants were sentenced with the same base offense level as Mr. Chinchilla (involving large-capacity firearms and a conviction for 18 U.S.C. § 933). Exhibit 12. One comparison case that the defense has identified is described in a DOJ press release offered as Exhibit 13. That defendant was a ringleader who was responsible for the unlawful purchase of ninety-four firearms, some of which were confirmed to have landed in the possession of Mexican drug traffickers. He was already a felon, and he did not accept responsibility. His ultimate sentence was sixty months. In other words, a defendant with organizational responsibility, a similarly substantial number of firearms, international transfer, and a worse criminal history received a sentence substantially lower than what Mr. Chinchilla now requests.

As for JSIN data, there were ten defendants in the same cell as Mr. Chinchilla. Exhibit 14. Their average sentence was eighty-nine months, well below the advisory guideline sentence. Two-thirds of them received a downward variance, and one-third received within-guidelines sentences. This data also suggests that the requested downward variance would not create unwarranted disparities.

### IV. CONCLUSION

Mr. Chinchilla, through counsel, respectfully requests that the Court consider all of the information contained in this Memorandum and vary downward to a sentence of seventy-eight months imprisonment. Such a variance is justified by his history and characteristics, by the overlapping enhancements, and by the totality of the factors enumerated in 18 U.S.C. § 3553.

Respectfully submitted,

*/s/ Nicole Lybrand*
Nicole Lybrand
AR Bar No. 2010215
NC Bar No. 59591
Senior Litigator
129 West Trade Street, Suite 300
Charlotte, NC 28202
Phone: (704) 374-0720
Fax: (704) 374-0722
Email: Nicole_Lybrand@fd.org

*/s/Elizabeth Gerber*
Elizabeth M. Gerber
N.C. Bar 43794
Federal Public Defender's Office
129 West Trade Street, Suite 300
Charlotte, NC 28202
Phone: (704) 374-0720
Fax: (704) 374-0722
Email: elizabeth_gerber@fd.org

***Counsel for Walter Adonai Rivera Chinchilla***

## CERTIFICATION

Pursuant to the Standing Order of this Court entered June 19, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies that with respect to this Memorandum,

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg; and

2. Every statement and every citation to an authority contained in this document has been

checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 10th day of February, 2026.

                                              */s/Elizabeth Gerber*
                                              ***Assistant Federal Public Defender***

                                              */s/Nicole Lybrand*
                                              ***Senior Litigator***